**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| RTM MEDIA, L.L.C., | } | |
| | } | |
| *Plaintiff*, | } | |
| v. | } | Civil Case No. 4:07-cv-2944 |
| | } | |
| THE CITY OF HOUSTON, | } | |
| | } | |
| *Defendant*. | } | |

**MEMORANDUM OPINION AND ORDER**

Presently before the Court are Defendant The City of Houston's Motion for Summary Judgment (Doc. 69) and Plaintiff RTM Media, L.L.C.'s Motion for Summary Judgment (Doc. 89). Having considered these documents, the responses and replies thereto, and the relevant legal authority, the Court hereby ORDERS that Defendant's motion (Doc. 69) is GRANTED and Plaintiff's motion (Doc. 89) is DENIED.

I.        Background and Relevant Facts

Plaintiff RTM Media, L.L.C. ("RTM") initially filed suit against The City of Houston (the "City") on September 12, 2007 (Doc. 1). On September 14, 2007, RTM filed its First Amended Complaint and Motion for Temporary Restraining Order and Preliminary Injunction alleging that: (1) the Sign Code unconstitutionally distinguishes between signs displaying commercial speech and signs displaying noncommercial speech; (2) criminalizing an activity permitted by the state violates due process; and (3) the Sign Code cannot legally or constitutionally be applied to persons who merely advertise on a billboard (Doc. 3). After holding a hearing, the Court issued an order granting RTM's motion for a preliminary injunction

(Doc. 12).   Subsequently, the Court held a second hearing and issued an Order Clarifying Preliminary Injunction Entered September 26, 2007, wherein it ordered as follows:

> [B]ecause there is a substantial likelihood that its content-based distinction between commercial and noncommercial speech violates the Free Speech Clause of the First Amendment, pending a trial on the merits, the City of Houston shall be enjoined (1) from enforcing its Sign Code, codified at Chapter 46 of the City of Houston Building Code, as to existing billboards in the [extraterritorial] jurisdiction of the City of Houston, against RTM Media, L.L.C., its advertisers, vendors, owners, lessors and/or lessees, and (2) from fining or threatening to fine advertisers placing advertisements on billboards owned by RTM Media, L.L.C.

(Doc. 36).   Both Plaintiff and Defendant have filed motions for summary judgment.   Before addressing the arguments presented in each of their briefs, as well as those in their responses and replies thereto, the Court provides the following factual background.

The City adopted the Sign Code in 1980 "to regulate signs and billboards and the permitting thereof" based on its findings that "the unregulated construction of signs, billboards, and other outdoor advertising structures can present" both "structural hazards which threaten the health and safety of the citizens of the City" and "impediments and dangers to traffic along City thoroughfares and easements."  (Doc. 69 Ex. 1 at 000610).  Additionally, the City found that "the continued construction of off-premise signs leads to the diminution of property values for adjacent properties and thereby adversely impacts on the taxable value of such affected properties," as well as an "increased risk of distraction and danger to citizens driving and walking on streets and thoroughfares due to Houston's present high volume of traffic on streets and thoroughfares."  (*Id.* at 000611).  Several provisions of the Sign Code are relevant to the Court's determination in the instant case.

The City's Sign Code defines "sign" as follows:

> [A]ny outdoor display, design, pictorial or other representation that shall be so constructed, placed, attached, painted, erected, fastened or manufactured in any manner whatsoever so that the same shall be ***used for advertising***.  The term "sign" shall include the sign structure.  Every sign shall be classified and conform to the requirements of each of such classifications set forth in this chapter.

(Doc. 69 Ex. 2 at 001035) (emphasis added).  Specifically, an "off-premise sign" is defined as follows:

> [A]ny sign that advertises a business, person, activity, goods, products or services not usually located on the premises where the sign is installed and maintained, or that directs persons to any location not on the premises.

(*Id.* at 001038).  In a section entitled "Abatement of Off-Premise Signs," the Sign Code states, in pertinent part:

> (b) Declared Nonconformity. All off-premise signs within the sign code application area are hereby declared to be nonconforming and unauthorized.   The subject signs shall be removed following amortization as provided in Article 1, Section 6(k) of Chapter 221, Acts of the 69th Legislature, Regular Session, 1985.
>
> (c) Exclusion. The provisions of this section shall not be construed to require the removal of a structure that is ***used exclusively and at all times (except when there is no copy at all on the structure) for messages that do not constitute advertising, including, but not limited to, political messages, religious or church related messages, public service, governmental and ideological messages and other copy of a nature that is not commercial advertising because such a structure is not a "sign"*** (either on-premise or off-premise), as that term is defined, for purposes of this chapter and is not subject to regulation under this chapter.  A structure that is subject to regulation under this chapter may contain non-commercial messages in lieu of or in addition to any other messages, but the structure shall not be exempt from regulation as a sign under this chapter unless used exclusively and at all times as provided above for non-commercial messages.

(*Id.* at 001106) (emphasis added).  Additionally, the Sign Code prohibits new off-premise signs as follows:

> From and after the effective date, no new construction permits
> shall be issued for off-premise signs within the sign code
> application area.  This prohibition shall apply to all classifications
> of signs, types of signs, and special function signs, and all other
> signs used as off-premise signs, including portable signs, with the
> exception that off-premise signs that advertise the sale or rental of
> real property or direct persons to the location of real property for
> sale or rental, which signs shall be limited to 40 square feet in area,
> shall continue to be permitted for a single three-year term.

(*Id.* at 001086).  The distinctions between commercial and non-commercial speech made in these provisions form the basis of Plaintiff's First Amendment and equal protection arguments in the instant case.

The City has presented evidence on the effects the Sign Code has had on reducing the total number of billboards.  Susan Luycx ("Luycx") has been employed with the City since 1996 and was appointed to serve as the City's Sign Administrator in December 2005.  (Luycx Decl., Doc. 69 Ex. 5 at 1).  As the City's Sign Administrator, Luycx is responsible for enforcing the Sign Code.  (*Id.*).  Additionally, she is the custodian of records for the Sign Administration Department of the City's Code Enforcement Division.  (*Id.*).  Attached to her declaration are two exhibits, A and B.[1]

Exhibit A is a copy of a spreadsheet reflecting the inventory of off-premise signs existing in the City and its extra-territorial jurisdiction ("ETJ") as of September 13, 1996, as well as certain signs that had been removed prior to that date and since the Sign Code's enactment in 1980.  (*Id.*)  This spreadsheet shows that the number of off-premise signs in the City limits as of 1980, the year the Sign Code was enacted, and in the City's ETJ as of 1986, the year the City expanded the Sign Code's application area to cover the ETJ, was at least 8,119 off-premise sign faces and 5,058 off-premise sign structures.  (*Id.*).  As of September 1996, however, at least

---

[1] Plaintiff RTM has objected to the City's evidence of the number of commercial and noncommercial signs, which is based on the Luycx declaration and exhibits thereto.  The Court overrules RTM's objection and finds that this evidence is admissible hearsay under the business record exception in Federal Rule of Evidence 803(6).

2,124 sign faces and 1,358 sign structures had been removed.  (*Id.*).  Exhibit B is a spreadsheet reflecting the inventory of off-premise signs existing in the City and its ETJ as of January 14, 2008.  (*Id.* at 2).  This spreadsheet states that the total number of off-premise signs in the City and its ETJ as of January 14, 2008, was 4,112 sign faces and 2,474 sign structures.  (*Id.*).  Therefore, based on these numbers, the total amount of off-premise sign faces and sign structures in the City and its ETJ has decreased by 50.64% and 48.91%, respectively.

Furthermore, Luycx states that, as of January 17, 2008, approximately 300 of the off-premise signs in the City and its ETJ possessed non-commercial messages.  (*Id.*).[2]

Additionally, Plaintiff contends the City has violated its due process rights by acting without any legal basis in depriving Plaintiff of its property and destroying its business. Plaintiff's billboards at issue in this case are those on interstate and primary state highway systems beyond the City's limits but within its ETJ.  "The [ETJ] of a municipality with 100,000 or more inhabitants, such as Houston, is 'the unincorporated area that is contiguous to the corporate boundaries of the municipality and that is located within five miles of those boundaries.'"  *Brooks v. State*, 226 S.W.3d 607, 608 (Tex. App.—Houston [14th Dist.] 2007) (citing Tex. Loc. Gov't Code Ann. § 42.021(5)).  The City argues it can prohibit placement of billboards in the ETJ.  RTM argues that it need not obtain permits from the City because it has obtained permits from the State for erecting and maintaining billboards in the City's ETJ.

Plaintiff further asserts that the Sign Code cannot legally or constitutionally be applied to persons who merely advertise on billboards, and, thus, the City cannot properly fine or

---

[2] Luycx bases her conclusion on the observations of Sign Administration personnel and data reported by sign companies maintaining signs in the City and its ETJ.  Plaintiff RTM objects to this statement on hearsay grounds.  The Court overrules this objection and finds that, based on Luycx's position as Sign Administrator, it is within her "sphere of responsibility" to oversee off-premise sign data maintenance and enforcement activity.  *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005) (citations omitted).

threaten to fine Plaintiff's advertisers.  The Sign Code includes a provision regarding permits, §4605(a), which is instructive on this issue.  It states:

> No person shall erect, reconstruct, alter, relocate, or **use** a sign within the sign code application area without first having secured a written permit from the Sign Administrator to do so, subject to the exceptions set forth in Section 4605(b).

(Doc. 69 Ex. 2 at 001048) (emphasis added).

In a letter dated August 29, 2007, Arturo Michel, the City Attorney advised John Ludke, "you, through your billboard advertising with RTM Media, LLC, are in serious violation of the City of Houston Sign Code and you may be subject to fines."  (Doc. 75 Ex. 8).  The City Attorney then referenced two provisions from the City's Sign Code, §4605(a) and §4604(d), and continued as follows:

> The City of Houston has cited the owner of the sign, RTM Media, LLC, more than 1,500 times to no avail.  This letter serves as notice that 30 days from the date of this letter, the City of Houston intends to begin issuing citations to the advertisers who "use" these billboard signs that do not have the proper permits.
>
> Copies of the relevant sign ordinance provisions, Court of Appeals opinion upholding a $500 fine for "using a sign without a permit," a recent lawsuit filed by the City of Houston, and a list of the numerous RTM signs in violation are enclosed.  If your advertisement appears on any of these signs, we will ticket you.
>
> We urge your voluntary cooperation by immediately stopping your participation in these illegal billboards.

(*Id.*).  A similar letter was sent to each of RTM's advertisers.  Plaintiff contests the City's interpretation of the term "use" in §4605(a) to reach and fine its advertisers for their failure to obtain permits.  It contends that the Sign Code only requires the "person" who erects, maintains, owns, or leases the billboard, in other words, the person who is responsible for and controls the sign, to obtain a permit.

In its most recent filing, a response to RTM's motion for summary judgment, the City makes three arguments with respect to the interpretation of "use" in §4605(a).  First, "the Court should decline to exercise jurisdiction . . . because the claim entails no constitutional question and is merely a matter of construing a local ordinance."  (Doc. 90 at 14-15).  Second, "RTM lacks standing to assert the claim, which is predicated on the purported rights of RTM's advertisers rather than RTM itself."  (*Id.* at 15).  Lastly, and most significantly,

> [E]ven if RTM had standing to seek a declaration regarding the meaning of the Sign Code, the Court should decline to consider the claim because *the City hereby represents that it does not intend to pursue enforcement actions against RTM's advertisers (other than RTM) under current §4605(a) of the Sign Code based upon the advertisers' placement of advertisements on RTM's sign structures.*

(*Id.* at 16) (emphasis in original).

II.        Summary Judgment Standard

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).  The substantive law governing the suit identifies the essential elements of the claims at issue and, therefore, indicates which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  If the moving party

fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Once the movant meets its burden, however, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24.   The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).   To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir.1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence.  *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994);  *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992), *cert. denied*, 506 U.S. 825 (1992).  Nor are pleadings summary judgment evidence.  *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996) (citing *Little*, 37 F.3d at1075).  The non-movant cannot discharge his burden by offering vague allegations and legal conclusions.  *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990).  Nor is the court required by Rule 56 to sift through the record in search of evidence

to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins*, Inc., 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita*, 475 U.S. at 587-88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988). The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir. 1988).

III.     Discussion

A.     First Amendment

The First Amendment states, "Congress shall make no law . . . abridging the freedom of speech[.]"   U.S. Const., amend. I.   The Due Process Clause of the Fourteenth Amendment makes the First Amendment applicable to the States. *Stromberg v. California*, 283 U.S. 359, 368 (1931).   In *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557 (1980), the Supreme Court acknowledged, "[t]he Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id.*

at 562-63 (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 457 (1978)).  Nevertheless it observed that commercial speech "not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Id.*  "The First Amendment's concern for commercial speech is based on the informational function of advertising," and, "[c]onsequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Id.* at 563 (citation omitted).  "The government may ban forms of communication more likely to deceive the public than to inform it, or commercial speech related to illegal activity." *Id.* at 563-64 (citations omitted).

No one in the instant case has alleged that the advertisements on Plaintiff's billboards were false, misleading, or related to illegal activity.  Accordingly, the two-prong test outlined in *Central Hudson* shall apply.  "The State must assert a substantial interest to be achieved by restrictions on commercial speech." *Id.*  "The regulatory technique must be in proportion to that interest," and "[t]he limitation on expression must be designed carefully to achieve the State's goal." *Id.*  The Supreme Court, thus, established the following two criteria to measure compliance with this requirement:

> First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.

*Id.* at 564.  The restriction does not have to be the least restrictive means available, but there must be a reasonable fit between the government's goals and the means chosen to accomplish those goals. *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 480 (1989). In the instant case, therefore, the issue is whether there is a "reasonable fit" between the City's

interests in aesthetics, traffic safety, and protecting property values and the distinction made between commercial and noncommercial signs in the City's Sign Code.

In support of its First Amendment claim, RTM relies, almost exclusively, on *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993).   In that case, the City of Cincinnati had an ordinance banning newsracks on public property that contained commercial publications while allowing those with noncommercial publications.   The City of Cincinnati argued that this regulation would result in many fewer newsracks, thereby increasing safety and aesthetics in the city.   Discovery Network, Inc. ("Discovery Network"), which advertised its adult educational, recreational, and social programs in a free magazine that was distributed on newsracks in Cincinnati, sued the city asserting the unconstitutionality of the ordinance.   The Supreme Court determined,

> In the absence of some basis for distinguishing between "newspapers" and "commercial handbills" that is relevant to an interest asserted by the city, we are unwilling to recognize Cincinnati's bare assertion that the "low value" of commercial speech is a sufficient justification for its selective and categorical ban on newsracks dispensing "commercial handbills."

*Id.* at 428.   The Supreme Court further noted, "[t]he city has asserted an interest in [a]esthetics, but respondent publishers' newsracks are no greater an eyesore than the newsracks permitted to remain on Cincinnati's sidewalks. Each newsrack, whether containing 'newspapers' or 'commercial handbills,' is equally unattractive."   *Id.* at 425.   The Supreme Court concluded,

> Not only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship *whatsoever* to the particular interests that the city has asserted.   It is therefore an impermissible means of responding to the city's admittedly legitimate interests.

*Id.* at 424 (emphasis in original).[3]

This case is, however, distinguishable.  The Supreme Court in *Discovery Network* found that there was ample support in the record to conclude that the City of Cincinnati did not establish a reasonable fit as required by *Fox*.  *Id.* at 417 (citing *Fox*, 492 U.S. at 480).   The Supreme Court stated,

> [t]he ordinance on which [the City of Cincinnati] relied was an outdated prohibition against the distribution of any commercial handbills on public property.  It was enacted long before any concern about newsracks developed.  Its apparent purpose was to prevent the kind of visual blight caused by littering, rather than any harm associated with permanent, freestanding dispensing devices.  The fact that the city failed to address its recently developed concern about newsracks by regulating their size, shape, appearance, or number indicates that it has not "carefully calculated" the costs and benefits associated with the burden on speech imposed by its prohibition.  The benefit to be derived from the removal of 62 newsracks while about 1,500-2,000 remain in place was considered "minute" by the District Court and "paltry" by the Court of Appeals.  We share their evaluation of the "fit" between the city's goal and its method of achieving it.

*Id.* at 417-18 (footnote omitted).   By contrast, the City here has addressed its concern about billboards by regulating their size, shape, appearance, and number.  This illustrates that the City has strongly considered both the positive and negative effects its prohibition.  Additionally, the benefits derived from the prohibition of off-premise commercial signs has neither been "minute" nor "paltry" as is demonstrated by the 50.64% and 48.91% decrease in sign faces and sign structures, respectively, from 1980 until 2008.  This is drastically different than the minor effect

---

[3] Additionally, the Court considered and rejected the City of Cincinnati's argument that the newsrack ordinance was a content neutral restriction because "the interests in safety and aesthetics that it serves are entirely unrelated to the content of respondents' publications."  *Id.* at 429.  The Court determined that the ordinance was neither content neutral nor a valid time, place, or manner restriction on speech: "Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack."  *Id.*

the newsrack ordinance had in *Discovery Network*, and RTM's reliance on that case is misplaced.

In addition to *Discovery Network* being distinguishable, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981), is applicable to the instant case.  The ordinance challenged in *Metromedia* permitted onsite commercial advertising, but it prohibited other commercial and noncommercial advertising which used fixed-structure signs unless it was covered by one of the ordinance's twelve exceptions.  The Supreme Court, in a plurality opinion, found that, insofar as the ordinance regulated commercial speech, it satisfied the *Central Hudson* test.  The Court found that improving traffic safety and the appearance of the city were substantial government goals and that the ordinance was no broader than necessary to accomplish such goals.  *Id.* at 508.

Finally, various other courts have upheld similar ordinances to the one at issue here, by relying on *Metromedia* and/or by distinguishing *Discovery Network*.  For example, in *Paradigm Media Group v. City of Irving*, No. 3:01-CV-612-R, 2002 WL 1776922 (N.D. Tex. July 30, 2002), the issue presented was whether the City of Irving's commercial billboard ban, which provided exceptions for, among other things, advertising structures on the same site as large sports facilities, violated the First Amendment.  The district court, relying on *Metromedia* and its application of the commercial speech framework of *Central Hudson*, determined that the ordinance was narrowly tailored and passed constitutional muster:

> If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them.  The city has gone no further than necessary in seeking to meet its ends.  [I]ndeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards, but allows onsite advertising and some other specifically exempted signs.

*Paradigm Media Group*, 2002 WL 1776922, at *7 (quoting *Metromedia*, 453 U.S. at 508; citing

*Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 810-16 (1984)).

In *Paradigm Media Group*, the court found that there were "opportunities for commercial speech

through the medium of signs [which] assure that such form of expression is not suppressed,

while at the same time the prohibition on new billboards effectively advances the City's aesthetic

objectives."[4]  *Id.*  The court, therefore, found that the City of Irving was entitled to summary

judgment on Plaintiff's First Amendment claim, and the Fifth Circuit affirmed this decision.  *See*

*Paradigm Media Group, Inc. v. City of Irving*, 65 Fed. Appx. 509 (5th Cir. 2003).

Other cases from outside of the Fifth Circuit also provide persuasive authority on

this issue.  For example, in *Riel v. City of Bradford*, 485 F.3d 736 (3rd Cir. 2007), the court

found that city ordinances regulating the display of commercial and noncommercial signs on

private property without first obtaining a permit were constitutional under the First Amendment.

In addressing the issue of whether a city's goals "fit" its methods of achieving such goals, the

*Riel* court stated,

> [a]s the City has explained, "the vast majority of signs within the
> City and the Historic District are commercial signs, and such signs
> tend to be erected for longer periods of time and tend to be larger
> and more elaborate in design." Thus, regulating those signs
> directly advances the interests asserted by the City, and the
> provisions do not fall because of the holding in *Discovery
> Network*.

*Id.* at 753 (citing to *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n,* 100 F.3d 175,

190 (1st Cir. 1996) (upholding a regulation prohibiting commercial news racks in an historic

Boston neighborhood because the benefit was not "minute" and "paltry" as it was in *Discovery

Network*); *Infinity Outdoor, Inc. v. City of New York,* 165 F.Supp.2d 403, 420 (E.D.N.Y. 2001)

---

[4] The City of Irving ordinance allowed outdoor advertising in three circumstances: "(1) onsite monument and pole signs; (2) on billboards and advertising structures that pre-existed the ban adopted on June 3, 1999; and (3) prospectively, on advertising structures at sports facilities."  *Id.* (footnote omitted).

(holding that a billboard regulation that distinguished between off-site commercial signs and off-site noncommercial signs did not fall under *Discovery Network* because the regulation had "more than a minimal impact on the overall number of billboards")).

Accordingly, the Court accepts the City's argument that there is a "reasonable fit" between the distinction between commercial and noncommercial speech and its goals of aesthetics, traffic safety, and protecting property values. The Court, therefore, finds that the City's Sign Code is constitutional under the First Amendment.

B.    Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment states, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV. In its motion for summary judgment, Plaintiff RTM argues that the Sign Code's distinction between commercial and noncommercial signs violates the Equal Protection Clause. "Because regulation of commercial speech is subject to intermediate scrutiny in a First Amendment challenge, it follows that equal protection claims involving commercial speech also are subject to the same level of review." *Chambers v. Stengel*, 256 F.3d 397, 401 (6th Cir. 2001) (citing *R.A.V. v. City of St. Paul,* 505 U.S. 377, 385 n. 4 (1992) (noting that the First Amendment underlies the Court's equal protection analysis))). "Strict scrutiny is clearly inappropriate." *See Dunagin v. City of Oxford, Miss.*, 718 F.2d 738 (5th Cir. 1983) (*en banc*). The Court found that the Sign Code satisfied the intermediate scrutiny standard set forth in *Central Hudson*. Accordingly, the Court finds that Plaintiff's equal protection claim must also fail.

C.    Due Process Clause

Under the regulations issued pursuant to the Federal Highway Beautification Act, the State is authorized to "set criteria for size, lighting, and spacing of outdoor advertising signs

located in commercial or industrial zoned or unzoned areas . . . adjacent to Interstate and Federal-aid primary highways."  23 C.F.R. § 750.706(a).  Additionally, "[i]f the zoning authority has been delegated, extraterritorial, jurisdiction under State law, and exercises control of outdoor advertising in commercial and industrial zones within this extraterritorial jurisdiction, control by the zoning authority may be accepted in lieu of agreement controls in such areas."  23 C.F.R. § 750.706(c)(3).  Plaintiff argues that federal regulations do not allow the State, without risking highway funding, to cede control of signs along federally funded highways in the ETJ if the City does not zone the ETJ.  Under the regulations, therefore, Plaintiff asserts that the City cannot assume control of signs in the ETJ from the State because the City does not have zoning. Additionally, Plaintiff maintains that since the State has not, in fact, ceded control of the ETJ to the City and because the State does issue permits for billboards in the ETJ, Plaintiff is not required to seek an additional permit from the City.[5]

The Due Process Clause of the Fourteenth Amendment states, in pertinent part, "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV.  In the instant case, Plaintiff alleges the City acted without any legal basis to deprive Plaintiff of its property and destroy its business.  A resolution of this issue turns on whether the City or the State, at all relevant times, maintained control over the City's ETJ. Because Plaintiff asks the Court to order relief that would likely interfere with the ongoing state court action of *City of Houston v. Brooks, et al.* (Cause No. 2007-42941), the Court declines to decide this issue under the doctrine announced in *Younger v. Harris*, 401 U.S. 37 (1971).

---

[5] Plaintiff notes that a new law was enacted in the 2007 session of the Texas Legislature which forbids the Texas Department of Transportation from issuing a permit in the City or in the ETJ unless the City has issued a permit.  Tex. Transp. Code § 391.068.

"The *Younger* doctrine, which counsels federal-court abstention when there is a pending state proceeding, reflects a strong policy against federal intervention in state judicial processes in the absence of great and immediate irreparable injury to the federal plaintiff." *Moore v. Sims*, 442 U.S. 415, 423 (1979) (citing *Samuels v. Mackell*, 401 U.S. 66, 69 (1971)). *Younger* abstention "is generally deemed appropriate [when] assumption of jurisdiction by a federal court would interfere with pending state proceedings, whether of a criminal, civil, or even administrative character." *Louisiana Debating and Literary Ass'n v. City of New Orleans*, 42 F.3d 1483, 1489 (5th Cir. 1995) (quoting *Word of Faith World Outreach Center Church, Inc. v. Morales*, 986 F.2d 962, 966 (5th Cir.), *cert. denied*, 510 U.S. 823 (1993)).  The Court must apply the following three-prong test to determine whether *Younger* abstention applies: "(1) the dispute must involve an 'ongoing state judicial proceeding,' (2) an important state interest in the subject matter of the proceeding must be implicated, and (3) the state proceedings must afford an adequate opportunity to raise constitutional challenges." *Texas Ass'n Bus. v. Earle*, 388 F.3d 515, 519 (5th Cir. 2004) (citing *Wightman v. Tex. Supreme Ct.,* 84 F.3d 188, 189 (5th Cir.1996)). If all three elements of this test are met, the Court must abstain unless one of the following exceptions applies:

> (1) the state court proceeding was brought in bad faith or with the purpose of harassing the federal plaintiff, (2) the state statute is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence, and paragraph, and in whatever manner and against whomever an effort might be made to apply it," or (3) application of the doctrine was waived.

*Id.* (citations omitted).

Facial challenges to statutes on First Amendment grounds have been exempted from the abstention doctrine, which, itself, is "the exception and not the rule." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).  The Supreme Court has

held that "the abstention doctrine is inappropriate . . . where . . . statutes are justifiably attacked on their face as abridging free expression[.]"  *Dombrowski v. Pfister*, 380 U.S. 479, 489-90 (1965).  In cases involving facial challenges based on the First Amendment, the Supreme Court has been "particularly reluctant to abstain."  *City of Houston v. Hill*, 482 U.S. 451, 467-68 (1987) (citations omitted).  "In such case[s] to force the plaintiff who has commenced a federal action to suffer the delay of state-court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect."  *Id.* (quoting *Zwickler v. Koota*, 389 U.S. 241, 252 (1967)).  In the instant case, the Court declined to abstain from exercising jurisdiction at the time it issued the preliminary injunction because the City's Sign Code was being attacked on First Amendment grounds.  Now that the Court has decided this constitutional issue, it shall abstain from exercising jurisdiction over Plaintiff's due process claim for the reasons set forth below.

First, this dispute involves the ongoing state judicial proceeding of *City of Houston v. Brooks, et al.* (Cause No. 2007-42941) in the 295th District Court of Harris County, Texas, which includes causes of action for public nuisance, violations of two different provisions of the Sign Code, and unjust enrichment.  The City's argument in state court is that the defendants knowingly and intentionally violated the Sign Code and that these violations resulted from the defendants' construction and maintenance of off-premise signs within the City's ETJ and their failure to secure written permits from the City for these signs.  Therefore, in order for the state court to resolve the City's claim, it appears that it must determine which entity, the State or the City, maintained control of the City's ETJ.

Second, the Court finds that an important state interest in the subject matter of the proceeding in *City of Houston v. Brooks, et al.* is implicated.  Texas has a significant interest in overseeing billboard construction on its highways, as these structures affect traffic safety,

property values, and aesthetics.  Additionally, Texas, in order to be eligible for federal funding, must ensure that its highways conform to federal requirements.  Therefore, issues as to which entity oversees and grants permits for billboards in the City's ETJ and whether the conduct of the defendants in *City of Houston v. Brooks* constitutes a public nuisance and a violation of the City's Sign Code are of critical importance to Texas.

Finally, the parties have an adequate opportunity to raise constitutional challenges in the state court action of *City of Houston v. Brooks*.  Additionally, the Court notes that, based on the briefing submitted to the Court, it appears that RTM's due process claim is one that involves a constitutional question under Texas, as opposed to federal, law.[6]  It seems, therefore, that Texas state court would be the more appropriate forum in which to address Texas constitutional issues.  Consequently, the Court hereby abstains from addressing Plaintiff's due process claim in the instant case.

D.      Applicability of the Sign Code to Advertisers

Lastly, Plaintiff argues that the Sign Code cannot legally or constitutionally be applied to persons who merely advertise on billboards.  This argument is based on Plaintiff's interpretation of the term "use" in §4605(a) of the City's Sign Code.  RTM contends that the Sign Code only requires the "person" who erects, maintains, owns, or leases the billboard, in other words, the person who is responsible for and controls the sign, to obtain a permit.  Plaintiff concludes, therefore, that the City cannot properly fine or threaten to fine Plaintiff's advertisers.

---

[6] RTM argues, "[a]s the State of Texas, and not the City of Houston, controlled the regulation of signs in the extraterritorial jurisdiction, once the State had issued a permit for the erection of a sign, the City could not nullify that action by forbidding the sign to be erected or by punishing the person who erected the sign."  (Doc. 89 at 9).  RTM further states, "[a] city cannot 'make illegal that which is legal under the laws of the State of Texas,'" as it cites to *City of Wichita Falls v. Abell*, 566 S.W.2d 336, 339 (Tex. Civ. App. – Ft. Worth 1978, writ ref'd n.r.e.) and *City of Baytown v. Angel*, 469 S.W.2d 923, 925 (Tex. Civ. App. – Houston [14th Dist.] 1971, writ ref'd n.r.e.).  (*Id.*).  Both of these cases stand for the proposition that a municipal ordinance that is inconsistent with state law violates the Texas Constitution.

Based on language in the City's response to Plaintiff's motion for summary judgment, wherein the City represents that "*it does not intend to pursue enforcement actions against RTM's advertisers (other than RTM) under current §4605(a) of the Sign Code based upon the advertisers' placement of advertisements on RTM's sign structures*," (Doc. 90 at 16) (emphasis in original), the Court declines to resolve the proper interpretation of the term "use" in §4605(a) to ascertain whether it should, in fact, apply to Plaintiff's advertisers.

IV.       Conclusion

Accordingly, it is hereby

ORDERED that Defendant's motion (Doc. 69) is GRANTED and Plaintiff's motion (Doc. 89) is DENIED.  It is further

ORDERED that, because the City has represented that "it does not intend to pursue enforcement actions against RTM's advertisers (other than RTM) under current §4605(a) of the Sign Code based upon the advertisers' placement of advertisements on RTM's sign structures" (Doc. 90 at 16) (emphasis omitted), the City is prohibited from pursuing such enforcement actions.

SIGNED at Houston, Texas, this 29th day of September, 2008.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE